IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

_____
                                            )
CAROLYN SINGH,                              )
                                            )
        Plaintiff,                          )
    v.                                      )        C.A. No. 1:03CV01681
                                            )        (RCL)
THE GEORGE WASHINGTON                       )
UNIVERSITY, *et al.*                        )
                                            )
        Defendants.                         )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

        A university's judgment that a student has not satisfied its academic standards

calls for judicial deference.

> Such a judgment is by its nature more subjective and evaluative than the
> typical factual questions presented in the average disciplinary decision.
> Like the decision of an individual professor as to the proper grade for a
> student in his course, the determination whether to dismiss a student for
> academic reasons requires an expert evaluation of cumulative information
> and is not readily adapted to the procedural tools of judicial or
> administrative decision making.

*Bd. of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78, 90 (1978).

        Plaintiff Carolyn Singh ("Plaintiff"), however, would have this Court second

guess The George Washington University's (the "University") decision to dismiss her

from its School of Medicine and Health Sciences because of her poor academic record.

Her effort should not be countenanced.

        Plaintiff was a medical student at the University's School of Medicine and Health

Sciences.  She failed or otherwise received less than satisfactory grades in 7 of the 11

courses that she completed.  S.J. Exhibit 1 [Goldberg Dec. ¶ 3].[1]  And, based on her poor academic record, the School of Medicine and Health Sciences dismissed her.

Now Plaintiff has elected to burden this Court and the University with a patently groundless lawsuit.  She claims that the University, Defendant John F. Williams, M.D., Ed.D., and/or Defendant Rhonda M. Goldberg individually violated Title III of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12181, *et seq*.,[2] by dismissing her and not accommodating her alleged disabilities.[3]

But the undisputed facts make clear that Plaintiff cannot prevail under any legal theory.  Accordingly, as to her Complaint, the Court should issue a judgment in Defendants' favor as a matter of law.

Likewise, the undisputed facts establish that Defendant Goldberg is entitled to prevail on her defamation counterclaim.  Accordingly, as to that action, the Court should issue a judgment in her favor as a matter of law.

---

[1]    Citations to Associate Dean Rhonda M. Goldberg's Declaration are denominated "Goldberg Dec. ¶ ___."  Citations to exhibits to her Declaration are denominated "Goldberg Dec. Exhibit ___."

[2]    Title III of the ADA applies to places of public accommodations.  It provides that

> [n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

[3]    As originally filed, Plaintiff's Complaint contained eight "counts."  Counts I and II purported to state a claim for negligent misrepresentation and violations of the Americans with Disabilities Act.  Count III purported to state a claim for defamation.  Count IV purported to state a claim for negligent misrepresentation.  Counts V and VI purported to state a claim for defamation and violations of the Americans with Disabilities Act.  Count VII purported to state a claim for breach of contract.  And Count VIII purported to state a claim for violations of the Americans with Disabilities Act.

The parties, however, have stipulated to the dismissal, with prejudice, of Counts I through VII.  They have also stipulated to the dismissal with prejudice of Plaintiff's demand for compensatory damages, punitive damages, lost wages and all other forms of pecuniary relief.  *See Singh v. The George Washington University*, C.A. No. 1:03cv1681, Stipulation of Dismissal With Prejudice (D.D.C. July 28, 2004).

II.     FACTS[4]

    A.     **The Parties**

The University is a private, not-for-profit, higher education institution located in the District of Columbia.  It offers Medical Doctor degrees through its School of Medicine and Health Sciences.  S.J. Exhibit 1 [Goldberg Dec. ¶ 4]; Cplt. ¶ 4.[5]

Defendant Williams was the School of Medicine and Health Sciences' Dean at the time of Plaintiff's dismissal.  Cplt. ¶ 5.  Defendant Goldberg is its Associate Dean for Student Affairs.  Cplt. ¶ 6.

Plaintiff was an M.D. student in the University's School of Medicine and Health Sciences.  Cplt. ¶ 3.

    B.     **The School of Medicine and Health Sciences' Academic Dismissal Policies and Procedures**

        1.     **The Decelerated Program**

The School of Medicine and Health Sciences admitted Plaintiff through its Decelerated Program, Cplt. ¶ 8, which allows students to spread the normal first year M.D. curriculum over two years.  S.J. Exhibit 1 [Goldberg Dec. ¶ 5].

The Decelerated Program is available to School of Medicine and Health Sciences applicants who show promise, but who have demonstrated weaknesses or aberrations in their academic preparation that present cause for concern.  Typical examples include applicants with relatively low or inconsistent grades or MCAT scores.  S.J. Exhibit 1 [Goldberg Dec. ¶ 6].

---

[4]     To the extent that Defendants rely upon Plaintiff's rendition of the facts, they do so for the purposes of this Motion only.

[5]     Citations to Plaintiff's Complaint are denominated "Cplt. ¶ ___."

Under the rules for the Decelerated Program, participating students must achieve, in each three-or-more-credit course, a passing grade that is not lower than one standard deviation below the mean for the whole class. Students who fall below that level risk academic dismissal. And the Dean may dismiss them summarily. S.J. Exhibit 1 [Goldberg Dec. ¶ 7; Goldberg Dec. Exhibit A (Regulations for M.D. Candidates) ("Regulations"), § I].

### 2.    Generally Applicable Dismissal Policies and Procedures

Decelerated Program students also are subjected to the School of Medicine and Health Sciences' Regulations for M.D. Candidates, generally apposite to students at risk of academic dismissal. S.J. Exhibit 1 [Goldberg Dec. ¶ 8; Goldberg Dec. Exhibit A (Regulations), § C].

All students face that risk if, among other things they:

- receive a grade of conditional or an F in two or more required courses of more than three credits in any academic year;

- receive a grade lower than one standard deviation below the class mean in a three or more credit course; or

- receive a grade of conditional or an F in a required course after having been at risk of academic dismissal.

S.J. Exhibit 1 [Goldberg Dec. Exhibit A (Regulations), §§ C.1.b., C.1.f.].

The School of Medicine and Health Sciences gives a conditional grade to "[t]hose students who do not meet the minimum requirements established by the responsible department, but who could reasonably be expected to do so through a limited program of remedial work." S.J. Exhibit 1 [Goldberg Dec. Exhibit A (Regulations), § B.4].

A failing grade goes to "[t]hose students whose performance in a subject clearly falls so far below departmental passing standards that limited remedial work would be

inadequate to correct the deficiencies." S.J. Exhibit 1 [Goldberg Dec. Exhibit A (Regulations), § B.4].

The School of Medicine and Health Sciences Medical Student Evaluation Committee (the "MSEC") makes recommendations to the Dean concerning students at risk of academic dismissal. S.J. Exhibit 1 [Goldberg Dec. Exhibit A (Regulations), § C.4.]. On it sit faculty members, practicing physicians, research faculty, senior administrators and M.D. students. S.J. Exhibit 1 [Goldberg Dec. ¶ 9].

When a student is at risk of academic dismissal, the MSEC meets with her, reviews her academic record and any written statement that she submits. S.J. Exhibit 1 [Goldberg Dec. Exhibit A (Regulations), § C.4]. The MSEC then meets in executive session to develop a recommendation for the Dean. S.J. Exhibit 1 [Goldberg Dec. Exhibit A (Regulations), § C.4].

The Dean decides whether to dismiss the student or allow her to remain. S.J. Exhibit 1 [Goldberg Dec. Exhibit A (Regulations), § C.5].[6] Although not bound by its recommendation, Dean Williams has confidence in the MSEC's judgment in academic matters. S.J. Exhibit 2 [Williams Dec. ¶ 2].[7]

### C.     Plaintiff's Poor Academic Performance

#### 1.     Plaintiff's 2000-2001 Academic Year

Plaintiff began her studies during the fall 2000 semester. Cplt. ¶ 8. From the start, her performance was poor.

---

[6]     As previously discussed, the Dean may summarily dismiss Decelerated Program students who fall below the standard deviation requirement.

[7]     Citations to Dean Williams' Declaration are denominated "Williams Dec. ¶ ___". Citations to exhibits to Dean Williams' Declaration are denominated. Williams Dec. Exhibit ___.

In her first year -- termed her "1A Year" -- Plaintiff failed Cells and Tissues and fell below the one standard deviation requirement in Physiology. S.J. Exhibit 1 [Goldberg Dec. ¶ 10]; S.J. Exhibit 3 [Plaintiff Tr. 144, L. 15-21; Plaintiff Tr. 145, L. 16-22].[8] Thus, she faced academic dismissal. S.J. Exhibit 1 [Goldberg Dec. ¶ 10; Goldberg Dec. Exhibit B (Memorandum from Associate Dean Goldberg to Dean Williams, dated January 27, 2001 ("Goldberg Memorandum I")].

The MSEC reviewed her performance at its January 23, 2001 meeting. It recommended that she be allowed to remain in school and that she take and pass the summer remedial Cells and Tissues course. S.J. Exhibit 1 [Goldberg Dec. ¶ 11; Goldberg Dec. Exhibit B (Goldberg Memorandum I)].

Dean Williams concurred. S.J. Exhibit 1 [Goldberg Dec. ¶ 11; Goldberg Dec. Exhibit C (Letter from Dean Williams to Plaintiff, dated March 30, 2001)].

Through the date on which Dean Williams communicated his decision to her -- March 30, 2001 -- Plaintiff neither requested an accommodation nor told anyone at the University that she was disabled. S.J. Exhibit 3 [Plaintiff Tr. 153, L. 1-23; Plaintiff Tr. 156, L. 6 – Tr. 157, L. 5].

## 2.    Plaintiff's 2001-2002 Academic Year

Plaintiff's poor academic performance continued during her 2001 – 2002 academic year -- termed her "1B Year." She failed Neurobiology and fell below the one standard deviation requirement in Gross Anatomy and Microscopic Anatomy. S.J. Exhibit 3 [Plaintiff Tr. 158, L. 6–15; Tr. 158, L. 23 – Tr. 160, L. 23; Plaintiff Tr. 172, L. 16 - Tr. 173, L. 5]. Thus, she was again at risk of academic dismissal. S.J. Exhibit 3

---

[8]    Citations to Plaintiff's deposition transcript are denominated "Plaintiff Tr. ___, L.___." Citations to exhibits to Plaintiff's deposition transcript are denominated "Plaintiff Tr. ___, Exhibit ___."

[Plaintiff Tr. 161, L. 1 – 17].  And on January 17, 2002, she again went before the MSEC.  S.J. Exhibit 3 [Plaintiff Tr. 161, L. 22 – Tr. 162, L. 2].

Plaintiff told the MSEC that she attributed her poor performance to: (1) an error that she made when completing her Neurobiology answer sheet; and (2) being distraught over the September 11, 2001 terrorists' attacks.  S.J. Exhibit 3 [Plaintiff Tr. 163, L. 1 – Tr. 165, L. 23; Plaintiff Tr. 168, L. 4 – Tr. 169, L. 18].

The MSEC recommended she be allowed to continue her studies and that she remediate Neurobiology during the summer.  S.J. Exhibit 3 [Plaintiff Tr. 171, L. 18 – Tr. 172, L. 4].  Again, Dean Williams concurred.  S.J. Exhibit 2 [Williams Dec. ¶ 3]; S.J. Exhibit 3 [Plaintiff Tr. 171, L. 18 – 172, L.7].

As before, through the entire 2001-2002 academic year Plaintiff requested no accommodations and told no one at the University that she was disabled.  S.J. Exhibit 3 [Plaintiff Tr. 175, L. 18 – Tr. 176, L. 15].

Plaintiff alleges that after failing Neurobiology she discussed with Associate Dean Goldberg "the possible existence of some kind of test-taking disability."  Cplt. ¶ 10.  Associate Dean Goldberg recommended that Plaintiff seek help from the University's Counseling Center, which, among other things, offers study skills training.  S.J. Exhibit 1 [Goldberg Dec. ¶ 13].

Plaintiff visited the Counseling Center on January 9, 2002, explaining that she was having academic problems that were difficult for her to pinpoint.  S.J. Exhibit 3 [Plaintiff Tr. 223, L. 23 – Tr. 224, L. 15].  She suggested, however, that her extensive

involvement in extracurricular activities might be to blame.  S.J. Exhibit 3 [Plaintiff Tr. 224, L. 16–23].[9]

Plaintiff revisited the Counseling Center twice; on January 14, 2002 and January 15, 2002.  But, the Counseling Center heard nothing from her again until February 13, 2003, over a year later, when she reported that she was undergoing psychological testing with a private psychologist.  S.J. Exhibit 3 [Plaintiff Tr. 234, L. 19 – Tr. 237, L. 19]; S.J. Exhibit 4 [Davis Dec. ¶ 3].[10]

Plaintiff pleads that Associate Dean Goldberg should have recognized the purportedly "strong evidence" that Plaintiff had a learning disability.  Cplt. ¶ 12.  That evidence, according to Plaintiff, was the "disparity . . . in the time that [she] had put into certain things versus the results that were coming out."  S.J. Exhibit 3 [Plaintiff Tr. 204, L. 11 – Tr. 205, L. 16].

Plaintiff concedes, however, that the alleged disparity does not necessarily point to a learning disability:

> Q.     It's true, isn't it, that many people put in a lot of time to study but don't do well on tests; isn't that correct?
>
> A.     I'm not a test taking expert.  I can't comment on that.
>
> Q.     You're not denying that people study hard sometimes and don't do well on tests?
>
> A.     No, I'm not.

---

[9]     While in medical school, Plaintiff was (1) a student volunteer to the School of Medicine and Health Science's Admissions Committee; (2) President of the American Medical Association's student group; (3) student liaison to the Medical Society of the District of Columbia; (4) a student delegate to the American Medical Association; (5) a George Washington University Medical Center Student Council member; (6) the Medical School Student Council's Social Chair; (7) the American Medical Student Association's Coordinator for Primary Care Week and Breast Cancer Awareness; (8) the ISCOPES volunteer for The George Washington University Medical Center Mammovan; and (9) Orientation Coordinator for the University's Decelerated Program.  S.J. Exhibit 3 [Plaintiff Tr. 135, L. 8 – Tr. 139, L. 2].

[10]     Citations to the Dr. Debra Davis' Declaration are denominated.  "Davis Dec. ¶ ___."

Q.     And some of those people who study hard and don't do well may not have
       a learning disability at all; isn't that correct?

A.     That might be true.

Q.     So the fact that someone studies hard and doesn't do well on a test doesn't
       mean that that person has a learning disability, does it?

A.     I'm not a neuropsychologist.

Q.     You don't know?

A.     There -- it -- it depends.  It depends and I don't know.  I don't know for
       certain.

Q.     Someone might do poorly on a test because they hadn't slept well the
       night before, correct?

A.     Probably.

Q.     Someone might do poorly on a test because they misunderstood a
       question?  They might have no learning disability whatsoever but they
       might have misunderstood a question, correct?

A.     Probably.

Q.     Someone might do poorly on a test because they spent hours and hours
       studying the wrong subject matter, correct?

A.     That's probably true.

Q.     There are many reasons beyond a learning disability that could explain a
       poor result on a test; isn't that correct?

A.     That's correct.

S.J. Exhibit 3 [Plaintiff Tr. 205, L. 17 – Tr. 207, L. 5].

       Plaintiff further concedes that Associate Dean Goldberg reasonably could have

concluded from the facts before her that Plaintiff's poor academic performance had

nothing to do with a learning disability.

Q.     Miss Goldberg could have reasonably concluded that your performance on
       your test -- your poor performance on your tests in medical school could
       have related -- could have resulted from factors other than a learning
       disability; isn't that correct, Miss Singh?

A.     I don't – I don't know what goes through – I can't – I can't comment on what Dean Goldberg would think.

Q.     I'm not asking you what she would think.  I'm asking you isn't it reasonable, given what Miss Goldberg knew as of the time you had your meeting with her that we've been discussing, that your test performance, your poor test performance, might have resulted from factors other than a learning disability.

A.     Sure.

S.J. Exhibit 3 [Plaintiff Tr. 207, L. 13 – Tr. 208, L. 6].

### 3.     Plaintiff's 2002-2003 Academic Year

Plaintiff's poor academic performance resumed during the fall 2002 semester, when she received a failing grade in Pharmacology and a conditional grade in Microbiology, both required courses.   S.J. Exhibit 1[Goldberg Dec. ¶ 14]; S.J. Exhibit 3 [Plaintiff Tr. 176, L. 16 – Tr. 177, L. 10; Tr. 178, L. 21 – Tr. 179, L. 3].

Accordingly, Plaintiff was again at risk of academic dismissal.  S.J. Exhibit 1 [Goldberg Dec. Exhibit D (Memorandum from Dean Goldberg to Dean Williams, dated January 16, 2003) ("Goldberg Memorandum II")].  And on January 16, 2003, she again appeared before the MSEC.  S.J. Exhibit 1 [Goldberg Dec. Exhibit D (Goldberg Memorandum II)]; S.J. Exhibit 3 [Plaintiff Tr. 185, L. 1-5].

Plaintiff described to the members her study skills, reported that she was working with a tutor and explained that she was frustrated with her academic performance.

In terms of what I said, just to repeat what it was that I said, I explained my study skills.  I explained that I was working with a tutor and she was helping me to -- to improve certain areas.  And at the time it all -- it all lea back to the frustrations that I had had, that I was putting in all this time and that was what I was getting, but that . . . that's pretty much what I remember saying during the meeting.

S.J. Exhibit 3 [Plaintiff Tr. 188, L. 1-9]; S.J. Exhibit 1 (Goldberg Dec. Exhibit D (Goldberg Memorandum II).

But she said nothing about being disabled.  Nor did she request an accommodation.  S.J. Exhibit 3 [Plaintiff Tr. 189 L. 18-23].  Neither had she made such a statement or request to anyone at the School of Medicine and Health Sciences.  S.J. Exhibit 3 [Plaintiff Tr. 190, L. 4-13].

The MSEC unanimously recommended that the University dismiss Plaintiff academically.  S.J. Exhibit 1 [Goldberg Dec. Exhibit D (Goldberg Memorandum II)]; S.J. Exhibit 3 [Plaintiff Tr. 190, L. 14-16].

A few weeks later, on February 4, 2003, Plaintiff began to undergo psychoeducational testing with Anne Newman, Ph.D.  S.J. Exhibit 5 [Newman Tr. 11, L. 12 – Tr. 12, L. 3; Newman Tr.  42, L. 15-21]; S.J. Exhibit 6 [Newman Tr. Exhibit 6 (Report), p. 1].[11]

Dean Williams met with Plaintiff on February 11, 2003.  S.J. Exhibit 3 [Plaintiff Tr. 366, L. 2-4].  She explained to him why she wanted to go to medical school and to become a doctor.  She also explained the academic frustrations that she had experienced.  S.J. Exhibit 3 [Plaintiff Tr. 367, L. 7–15].

Dean Williams responded that the MSEC's dismissal decision was unanimous and that he would need "compelling" evidence to overturn it.  S.J. Exhibit 3 [Plaintiff Tr. 367, L. 17–21].

Plaintiff told him about the psychoeducational testing that she underwent, for the first time, one week prior to the February 11 meeting.  S.J. Exhibit 3 [Plaintiff Tr. 367, L. 22 – Tr. 368, L. 2].  She then lost her composure and asked Dean Williams to explain his

---

[11]    Citations to Dr. Anne Newman's deposition transcript are denominated.  "Newman Tr. ___, L. ___."  Citations to exhibits to her transcript are denominated.  "Newman Tr. Exhibit ___."

decision to her mother, who was waiting nearby. Dean Williams agreed. S.J. Exhibit 3 [Plaintiff Tr. 368, L. 7–13].

When Plaintiff's mother entered the room, Dean Williams reiterated that the MSEC's dismissal decision was unanimous. He said that he would review Dr. Newman's report. But he admonished that he would guarantee nothing. S.J. Exhibit 3 [Plaintiff Tr. 368, L. 14-22; Plaintiff Tr. 369, L. 23 – Tr. 370, L. 8]. Dr. Williams also told Plaintiff that she could appeal her dismissal to Dr. Lehman -- the University's Vice President for Academic Affairs -- and/or retain a lawyer. S.J. Exhibit 3 [Plaintiff Tr. 369, L. 6–18].

About two weeks later, Plaintiff forwarded Dr. Newman's report to Dean Williams. S.J. Exhibit 1 [Goldberg Dec. ¶ 15; Goldberg Dec. Exhibit E (Letter from Plaintiff to Dean Williams, dated February 26, 2003)]. Citing to Dr. Newman's impressions, Plaintiff contended that Dean Williams should reject the MSEC's dismissal recommendation and allow her to remain in school. *Id.*

Dean Williams replied, by letter dated March 5, 2003, stating that he had accepted the MSEC recommendation that she be dismissed. S.J. Exhibit 2 [Williams Dec. ¶ 4; Williams Dec. Exhibit A (Letter from Dean Williams to Plaintiff, dated March 5, 2003)]; Cplt. ¶ 56.

**D.    Plaintiff's Defamatory Statements Regarding Associate Dean Goldberg**

One June 11 and 12, 2003, Plaintiff republished defamatory statements about Associate Dean Goldberg, that Plaintiff's mother authored:

- My daughter trusted Ms. Goldberg, and itas (sic) hard to believe that someone could be so evil.

- Some of the acts by Ms. Goldberg are so criminal that they can only be dealt with by God.

- Ms. Goldberg "changed 3 of her [--Plaintiff's--] grades which were given to the decision-making committee at the medical school.

- All of the professors who wrote letters on Carolynas (sic) behalf were given false information by Ms. Goldberg.

- For her [--Associate Dean Goldberg --] to tell the committee they must dismiss her [--Plaintiff--] because she is not enjoying medical school and misleading the committee with incorrect grades is how the committee made their unanimous decision.

- Ms. Goldberg is destroying more Jewish lives.

S.J. Exhibit 3 [Plaintiff Tr. 52, L. 18-21]; S.J. Exhibit 7 [Plaintiff Tr. Exhibit 19A]; S.J. Exhibit 8 [Plaintiff Tr. Exhibit 19B].

Plaintiff dispatched the statements by electronic mail to a School of Medicine and Health Sciences student, Natalie Velasquez, S.J. Exhibit 3 [Plaintiff Tr. 255, L. 3-15]. Plaintiff, however, admits that she has no reason to believe that those statements are true. S.J. Exhibit 3, [Plaintiff Tr. 53, L. 3 – Tr. 65, L. 16].

## III.    ARGUMENT

### A.    Defendants are Entitled to a Judgment in their Favor as to Plaintiff's Complaint.

#### 1.    Standard for Granting Summary Judgment

Federal Rule of Civil Procedure 56 mandates entry of summary judgment if the record shows that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Summary judgment is not "a disfavored procedural shortcut."  Rather, it is an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citation omitted).

Rule 56 allows courts to "isolate and dispose of factually unsupported claims or defenses, and . . . it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323- 24. There is no need for a trial "unless there is sufficient evidence favoring the non moving party for a jury to return a verdict for that party." *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 39 (D.C. Cir. 1987), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

Summary judgment is especially appropriate in cases challenging an educational institution's decision to dismiss a student for academic reasons, a decision that strikes at the heart of the institution's educational mission.

> "Freedom of inquiry, freedom of discussion, and freedom of teaching – without these a university cannot exist." This is particularly true where the charges are aimed at the core of a teacher's authority, the student's grade. In such cases of academic dismissals, summary judgment, when properly employed, can serve the laudable function of protecting our crucibles of knowledge from the vagaries of the judicial system.

*Clements v. Nassau County*, 835 F.2d 1000, 1001 (2d Cir. 1987) (citations omitted).

The Supreme Court has long mandated deference to an educational institution's academic decisions. *See Horowitz*, 435 U.S. at 90; *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment."); *Horowitz*, 435 U.S. at 96 n.6 (Universities are entitled to the "widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation.") (Powell, J., Concurring).

Such deference is grounded in sound public policy. *Olsson v. Bd. of Higher Educ.,* 402 N.E.2d 1150, 1153 (N.Y. 1980).

> When a school issues a diploma to one of its students, it certifies to society that the student is well-versed in all of the knowledge and skills required by his or her chosen profession. Thus, to ensure society's confidence in the qualifications of individuals who have graduated from a particular educational institution, "it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis."

*Alden v. Georgetown Univ.*, 734 A.2d 1103, 1109 (D.C. 1999) (citations omitted).

Deference is particularly appropriate in the medical field because (1) students who receive medical degrees will provide care to the public; and (2) "courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine." *Alden*, 734 A.2d at 1110 (citations omitted). In the words of the Sixth Circuit:

> We should only reluctantly intervene in academic decisions "especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession."

*Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998) (quoting *Doherty v. Southern Coll. of Optometry*, 862 F.2d 570, 576 (6th Cir. 1988)).

Consistent with the foregoing principles, courts should not reverse academic dismissal decisions unless the dismissal has no rational basis or was motivated by bad faith or ill will. *See Ewing*, 474 U.S. at 225 (courts should not reverse an academic decision "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment"); *Greenhill v. Bailey,* 519 F.2d 5, 10 n.12 (8th Cir. 1975) ("For a court to overturn a student's dismissal on substantive grounds it must find that such dismissal was arbitrary and capricious . . . . Only the most compelling evidence of

arbitrary or capricious conduct would warrant our interference with the performance evaluation (grades) of a dismissed student made by his teachers."); *Clements*, 835 F.2d at 1004 ("In cases involving academic dismissal, educational institutions have the right to receive summary judgment unless there is evidence from which a jury could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance."); *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 25-26 (1st Cir. 1991) (same).

Plaintiff cannot meet this exacting standard.

### 2.  Plaintiff's ADA Claims are Meritless

#### a.  The University Dismissed Plaintiff for Legitimate and Good Faith Reasons

Plaintiff seeks relief under Title III of the ADA, claiming that the University dismissed her because she is disabled.   She is wrong.

To prevail in an ADA discriminatory dismissal claim, the plaintiff must prove that (1) she has an ADA disability; (2) she is otherwise qualified for the benefit in question; and (3) the defendant excluded her from the benefit based *solely* on her disability. *Ferrell v. Howard Univ.*, No. Civ. A. 98-1009, 1999 WL 1581759, at *3 (D.D.C. Dec. 2, 1999), *aff'd, without op.*, 254 F.3d 315 (D.C. Cir. 2000).

Defendants do not concede that Plaintiff is disabled.  But even if she is, her discriminatory dismissal claim must fail as a matter of law.

First, in view of her persistent poor academic performance, *see supra*, pp. 5-10, the conclusion is ineluctable that Plaintiff was not qualified to remain in medical school. *See Slaughter v. Howard Univ.,* 971 F. Supp. 613, 614 (D.D.C. 1997) ("A *prima facia* case of disparate treatment on these facts requires that a 'similarly situated' unprotected

employee be identified as a comparator."), *vacated on other grounds*, 172 F.3d 921 (D.C. Cir. 1998); *el Kouni v. Trs. of Boston Univ.*, 169 F. Supp. 2d 1, 4 (D. Mass. 2001) (disabled student who failed two medical school courses and received an unsatisfactory grade in a third is not qualified to remain in medical school); *Smith v. Chamber of Commerce*, 645 F. Supp. 604, 607 (D.D.C. 1986) ("In order to support the prima facie case requirement that plaintiff is 'qualified,' plaintiff must show that he met [the defendants'] legitimate expectations.").

Second, the undisputed evidence establishes that the University elected to dismiss Plaintiff because of her poor academic performance. *See supra*, pp. 5-12. That decision is entitled to deference. *See supra,* pp. 14-16.

Not a shred of evidence even remotely suggests that the decision stems from a discriminatory animus. To the contrary, Plaintiff admits that she is aware of no evidence or information that supports a belief the decision-maker -- Dean Williams -- is prejudiced against people with disabilities or people who have learning impairments. S.J. Exhibit 3 [Plaintiff Tr. 364, L. 23 – Tr. 365, L.10].

Indeed, it is undisputed that during Dean Williams' tenure as Dean, (1) the MSEC recommended eleven students for academic dismissal; (2) two of them, including Plaintiff, claim that they are disabled; and (3) Dean Williams followed the MSEC's recommendation on each occasion, dismissing everyone recommended for dismissal -- the purportedly disabled and the non-disabled alike. S.J. Exhibit 2 [Williams Dec. ¶ 5].

Plainly, a disability discrimination claim cannot survive where, as here, a university treats purportedly disabled students and non-disabled students the same. *See Brantley v. Indep. Sch. Dist. No. 625*, 936 F. Supp. 649, 657 (D. Minn. 1996)

(discriminatory discipline claim rejected absent evidence that the school disciplined the plaintiff more severely than it disciplined his non-disabled peers).

In short, Plaintiff's discriminatory dismissal claim fails as a matter of law.

### b.    Plaintiff was not Entitled to a Reasonable Accommodation

Plaintiff's failure to accommodate claim fares no better.

An academic institution can be expected to respond only to what it knows or is chargeable with knowing. *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795 (1st Cir. 1992). Accordingly, a university need not even consider accommodating a student until she has submitted a proper disability diagnosis and requested an accommodation. *Ferrell*, 1999 WL 1581759 at *5 ("Neither the Rehabilitation Act nor the ADA require a defendant to accommodate a plaintiff for a disability of which the defendant had no notice of at the time of the challenged action."); *Bugg-Barber v. Randstad US, L.P.*, 271 F. Supp. 2d 120, 130 (D.D.C. 2003) ("The employee bears the burden of requesting a necessary accommodation and, absent such a request, an accommodation claim fails."); *Becker v. Gallaudet Univ.*, 66 F. Supp. 2d 16, 22 (D.D.C. 1999) ("[T]he ADA does not impose a general duty on an employer to provide unrequested accommodations."); *Kaltenberger*, 162 F.3d at 437 ("[T]he College was not obligated to provide [an] accommodation until Plaintiff had provided a proper diagnosis of ADHD and requested specific accommodation.").

Here, it is undisputed that Plaintiff requested no accommodations and told no one at the University that she had a disability until *after* (1) she had amassed a poor record; and (2) the MSEC had *unanimously* recommended that the University dismiss her academically. *See supra,* pp. 5-12. As a matter of law, that was too late.

Plaintiff may rejoin that she told Dean Williams about her purported disabilities before he formally announced his decision to dismiss her. At that juncture, however, Plaintiff was not seeking a reasonable accommodation. Rather, she was asking the University to lower its academic standards, disregard her poor academic performance, and give her yet another chance -- her fourth. That, the ADA does not require. *See Ferrell*, 1999 WL 1581759 at *6 ("While it is true that the defendants had knowledge of plaintiff's disability at the time she sought readmission to the College of Medicine, any decision to readmit her would have been a *post hoc* exception to [the school's] policy of dismissing students who failed the [examination] three times. . . ."); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88 (2d Cir. 2004) ("Permitting a student who did not definitively prove her mastery of basic medical sciences to advance in the later stages of medical school, and become a treating physician who had direct contact with patients was something the medical school correctly believed would unreasonably alter the nature of its program."); *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1051 (9th Cir. 1999) ("Given Zukle's unenviable academic record, allowing her to remain in Medical School would have lowered the Medical School's academic standards, which it was not required to do to accommodate Zukle."); *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 154 (1st Cir. 1998) ("The law does not require an academic program to compromise its integral criteria to accommodate a disabled individual.").

Similarly, in the employment context, the courts have made clear that the ADA does not excuse misconduct or poor performance when the employee fails to notify her employer of a claimed disability until *after* the fact. *See, e.g.*, *Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999) (The ADA does not require employers

to give employees a second chance.); *Siefken v. Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995) (same); *Bugg-Barber*, 271 F. Supp. 2d at 131 ("[T]he Court concludes that Ms. Bugg-Barber is not looking for an 'accommodation' under the ADA, but a complete pardon.  This the law does not require.").

Neither can Plaintiff avoid summary judgment by contending that Associate Dean Goldberg somehow should have figured out that Plaintiff had a disability.

First, Plaintiff has testified, unequivocally, that the description of her academic difficulty that she gave to Associate Dean Goldberg does not necessarily point to a learning disability.  To the contrary, Plaintiff admits that Associate Dean Goldberg could reasonably have concluded that Plaintiff's poor academic performance was not disability-based.  *See supra*, pp. 8-10.

Second, as previously discussed, it was *Plaintiff's* burden to notify the University that she had a disability and request an accommodation.  *See supra*, p. 18.  That is a burden that she utterly failed to carry.  That Dean Goldberg did not guess that Plaintiff has a disability -- assuming that she does -- creates no issues of fact.  *See Marlon v. Western New England Coll.*, No. 01-12199DPW, 2003 WL 22914304, at *8 n.18 (D. Mass. Dec. 9, 2003)[12]

---

[12]    Holding:

Marlon contends that in her meeting with Alpert, she turned over medical records which put the College on notice of her CTS and psychological problems.  She further argues that, following her meeting with Alpert, the College should have initiated the informal, interactive process required by the ADA which would have revealed that Marlon has a specific learning disability.  Apart from being highly speculative, Marlon's argument misconstrues the idea behind the interactive process.  While the EEOC regulations state that it may be necessary" for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation," the point of undergoing such a process would be to determine appropriate accommodations for a known disability, not to identify undiscovered disabilities.

*Id*. (citations omitted).

In short, Plaintiff's failure to accommodate claim, like her discriminatory dismissal claim, must fail as a matter of law.

### c.    Dean Williams and Associate Dean Goldberg are Not Proper ADA Defendants

Plaintiff's ADA claims against Dean Williams and Associate Dean Goldberg fail and must be dismissed for the additional reason that they are not proper ADA defendants. *See Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3rd Cir. 2002); *Coddington v. Adelphi Univ.,* 45 F. Supp. 2d 211, 217 (E.D.N.Y. 1999).

### B.    Associate Dean Goldberg is Entitled to a Judgment in Her Favor as to Her Counterclaim for Defamation

#### 1.    Plaintiff has Defaulted

Associate Dean Goldberg filed her counterclaim on November 20, 2003.  In the nine months since then, Plaintiff has failed to file a responsive pleading.  Thus, the Court should enter a default against her, under Federal Rule of Civil Procedure 55.

#### 2.    Associate Dean Goldberg is Entitled to a Judgment in her Favor as to the Merits of her Defamation Counterclaim

Moreover, the undisputed facts establish that Associate Dean Goldberg also must prevail as a matter of law on the merits of her counterclaim.

There is no dispute that (1) Plaintiff libeled Associate Dean Goldberg in her trade, profession, or business, S.J. Exhibit 3 [Plaintiff Tr. 52, L. 18-21]; S.J. Exhibit 7 [Plaintiff Tr. Exhibit 19A]; S.J. Exhibit 8 [Plaintiff Tr. Exhibit 19B]; and (2) Plaintiff has absolutely no reason to believe her scandalous statements about her are true.  S.J. Exhibit 3 [Plaintiff Tr. 53, L. 3 – Tr. 65, L. 16].  That constitutes libel *per se* for which Associate Dean Goldberg is entitled to damages. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001) ("A statement is defamatory 'if it tends to injure plaintiff in his trade,

profession or community standing, or lower him in the estimation of the community.'" (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293-1294 (D.C. Cir. 1998)); *Robertson v. McCloskey*, 680 F. Supp. 414, 415-16 (D.D.C. 1988); *Croixland Properties Ltd. P'ship v. Corcoran*, 174 F.3d 213, 215 (D.D.C. 1999).

Accordingly, the Court should enter judgment in Associate Dean Goldberg's favor as to her defamation claim.

## IV.    CONCLUSION

Plaintiff may not be happy that the University decided to dismiss her. But there is nothing arbitrary or capricious about the decision. Nor is there any evidence it was motivated by bad faith, ill will, or a discriminatory animus.

Rather, the undisputed evidence establishes that the University dismissed her for legitimate reasons, based upon her poor academic record. And, as a matter of law, that decision is entitled to deference.

Thus, Defendants submit that the Court should grant their Motion for Summary Judgment and enter a judgment in their favor as to the Complaint.

Likewise Associate Dean Goldberg submits that the Court should enter a judgment in her favor as to her defamation counterclaim.

Respectfully submitted,


ARENT FOX PLLC

By:      /s/ Henry Morris, Jr.
          Henry Morris, Jr. (#375894)
          Savalle C. Sims (#457469)
          Anita D. Khushalani (#485985)
          1050 Connecticut Ave, N.W.
          Washington, D.C. 20036-5339
          (202) 857-6000/Telephone
          (202) 857-6395/Facsimile

          *Counsel for Defendants*

LDR/122495.4