UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
Carolyn Singh,                                      )
                                                    )
            Plaintiff,                              )
                                                    )
    v.                                              )          Civil Action No. 03-1681 (RCL)
                                                    )
The George Washington                               )
University, et al.,                                 )
                                                    )
            Defendants.                             )
_____)


MEMORANDUM OPINION AND ORDER

Before the court in this Americans with Disabilities Act (ADA) case are the parties'

cross- motions [21 and 25] for summary judgment.  For the reasons set forth below, these

motions are each granted in part and denied in part.  Also before the court, and dealt with in this

Memorandum Opinion and Order, are various motions related to the summary judgment motions

[22, 30, and 33] and related to defendant Goldberg's counterclaim for defamation [29 and 37].


I.      SUMMARY JUDGMENT FRAMEWORK


        Summary judgment is appropriate when the motion papers, affidavits, and other

submitted evidence demonstrate that no genuine issue of material fact exists and that the moving

party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986).  Whether a fact is "material" is determined in light of the

applicable substantive law invoked by the action.  See Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  In light of the applicable substantive law, a "genuine issue of material fact" is a

fact that is determinative of a claim or defense, and therefore, affects the outcome of the case.

See Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 248.  The moving party bears the initial

burden of demonstrating that no genuine issues of material fact are in dispute.  Upon such a

showing, the burden then shifts to the non-moving party to demonstrate that genuine issues of

material fact are in dispute.  The Court is precluded from weighing evidence or finding disputed

facts and must draw all inferences and resolve all doubts in favor of the non-moving party.  See

Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).


II.     FACTUAL BACKGROUND


        Plaintiff Carolyn Singh was once a medical student at The George Washington University

School of Medicine and Health Sciences ("School").  Plaintiff was part of the School's

Decelerated Program.   The Decelerated Program is available to School applicants who show

promise but who have weaknesses or aberrations in their academic records that present cause for

concern.  The program allows these students to complete the traditional first-year curriculum

over two years instead of one.  The School admitted plaintiff for the fall 2000 term.  The School

dismissed plaintiff from the School in 2003.

        The School publishes a bulletin that sets forth academic requirements, circumstances that

would subject a student to risk of dismissal, and the process that the School takes when

considering whether to dismiss a student.  Failing and conditional grades put students at risk for

dismissal.  Failing grades are given to students who have not met a department's minimum requirement and who could not meet that requirement through remedial work.  Conditional grades are given to students who have not met a department's minimum requirement but who could meet that requirement after remedial work.  Students completing the first-year curriculum in the decelerated program are subject to dismissal for, in any single course, failing, receiving a conditional grade, or receiving a grade less than one standard deviation from the mean grade.  All students are subject to dismissal for various shortcomings, including the receipt of two grades of failing or conditional during the first semester of the first year or one such grade after previously being at risk of dismissal.

Decisions to dismiss students are made by the School's Dean after a hearing.  The School has a Medical Student Evaluation Committee ("MSEC") that makes advisory recommendations to the Dean about whether to dismiss students who are at risk of dismissal because of poor academic performance.  To formulate its recommendations, the MSEC meets with at-risk students, reviews their academic records, and reads any written statements that these students submit.  The Dean's decision concerning dismissal must be in writing.

During Dean Williams' tenure at the School, the MSEC recommended 11 students for dismissal, including plaintiff.  Dean Williams followed the MSEC's recommendation in each case and dismissed each student.  (Def. Mot. for Summary Judgment, Exh. 2, ¶ 5.) (Williams Dec.).

Plaintiff began her studies as a decelerated student at the School in Fall of 2000.  During her first semester, she failed Cells and Tissue and was further than one standard deviation off the mean grade in Physiology, which both put plaintiff at risk for dismissal.  The MSEC met to

review plaintiff's status on January 23, 2001.  The MSEC recommended, and the Dean

concurred, that plaintiff could remain at the School provided she passed Cells and Tissues over

the summer.  Plaintiff passed the summer Cells and Tissue course and returned to the School for

the fall 2001 term, at which time she would begin the second half of the first-year curriculum.

This time, she failed Neurobiology and fell below the standard deviation in Gross Anatomy and

Microscopic Anatomy, again subjecting her to the risk of dismissal.  On January 12, 2002, the

MSEC again met to consider plaintiff's status at the School.  At this meeting, plaintiff blamed

her poor performance on an error she made while completing an exam answer sheet in her

Neurobiology class and on stress related to the September 11 attacks.  Again, the MSEC

recommended, and the Dean concurred, to keep plaintiff in the program and that she take

Neurobiology over the summer, which she took and passed.

Upon returning to the School in the fall of 2002, plaintiff had completed the first-year

curriculum and was part of the regular Medical Doctor program.  But plaintiff again had

academic trouble.   In fall of 2002, she failed Pharmacology and received a conditional grade in

Microbiology, again putting herself at risk of dismissal.  On January 16, 2003, plaintiff's status

came before the MSEC for a third time.  The MSEC voted unanimously to dismiss plaintiff from

the School and Associate Dean Goldberg informed plaintiff of the MSEC's decision by phone

that same night.

Plaintiff, looking to explain her poor performance, contacted the School's Disability

Support Services ("DSS") in late January of 2003 and visited Dr. Anne Newman, a psychologist,

on February 4, 5, and 10, 2003.  DSS notified Associate Dean Goldberg on February 6 and Dean

Williams on February 10 that plaintiff was registered with DSS and was undergoing tests for

4

learning disabilities.  On February 11, Dean Williams met with plaintiff and her mother.  What was said at this meeting is disputed.  On February 21, Dr. Newman completed her evaluation. She concluded that plaintiff had dyslexia, a mild disorder of processing speed, and a phonological disorder.  Dr. Newman recommended that plaintiff receive, among others, the following accommodations: double time on exams, access to lecture notes, tutors, and laptop computer for typing essay exams.  On February 26, plaintiff provided a copy of this evaluation to Dean Williams along with a letter that she wrote urging the Dean to permit her to stay at the School or to have the MSEC review her case, now "that with accommodations, I will be a very successful medical student."  (Pl. Mot for Summary Judgment, Exh. 3.) (letter from plaintiff to Dean Williams)

On March 5, 2003, Dean Williams responded to plaintiff's letter.  He stated that he had accepted the MSEC recommendation and dismissed her at the February 11 meeting effective immediately and that he had never agreed to defer a decision about plaintiff until after her disability testing results were available: the decision was based on academic failure alone.  (Pl. Mot for Summary Judgment, Exh. 6.) (letter from plaintiff to Dean Williams).  The Dean's deposition testimony further clarifies that while he read Dr. Newman's report, the report played no role in his decision to dismiss plaintiff.   (Pl. Mot for Summary Judgment, Exh. 9, p. 25.) (deposition of Dean Williams)


III.    ANALYSIS

Plaintiff has brought suit under the ADA.  Section 302 of Title III of the ADA provides that:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).  To establish a violation of this provision, plaintiff must prove: "(1) that she has a disability; (2) that she is otherwise qualified for the benefit in question; and (3) that she was excluded from the benefit due to discrimination because of the disability." Kaltenberger v. Ohio College of Podiatric Med., 162 F.3d 432, 435 (6th Cir. 1998); cf. Ferrell v. Howard Undiversity, No. 98-CV-1009, 1999 WL 1581759, at *3 (D.D.C. Dec. 2, 1999), aff'd 254 F.3d 315 (D.C. Cir. 2000).

### A.   Disability

Under the ADA, a protected disability is "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A).  Based on this definition, courts require an ADA plaintiff to (1) have an impairment (2) that is related to a major life activity (3) and that substantially limits that major life activity. Haynes v. Williams, 392 F.3d 478, 481-82 (D.C. Cir. 2004).  On the issue of disability, the court will consider plaintiff's and defendants' motions separately.

### 1.   Plaintiff's Motion for Summary Judgment

#### a.   Impairment

Plaintiff has offered un-rebutted evidence of a mental impairment; though the nature of that impairment is hotly disputed.  To show impairment, plaintiff put forward Dr. Newman's

February evaluation that concludes that plaintiff "meets diagnostic criteria for Reading Disorder (784.61 – Dyslexia), Mild Disorder of Processing Speed (349.9 – Disorder of Central Nervous System, Unspecified), and Disorder of Phonological Awareness (388.43 – Disorder of Auditory Discrimination)."  (Pl. Mot. for Summary Judgment, Exh. 2, p. 7.) (Dr. Newman evaluation). The report further concludes that these disorders are longstanding though their effects on her academic performance, for various reasons, did not become clear until medical school.  Id. Defendants contest the Newman report and have put forward the report of Dr. Rick Ostrander, Chief of Neuropsychology of the Division of Child and Adolescent Psychiatry at Johns Hopkins University.  Dr. Ostrander reviewed Dr. Newman's data and plaintiff's academic history and concluded that the "test data does not support the type of neuropsychological deficits or associated academic deficits . . . that are most commonly associated with dyslexia or a specific learning disability in reading."  (Def. Opp. and Reply, Exh. 4, p. 12.)  Dr. Ostrander found it more likely that plaintiff's recent academic failures, as compared to her previous moderate to high success in endeavors such as the SAT and college,  were due to a psychiatric disorder such as depression.  Id.

Dr. Ostrander's report creates a factual dispute as to what kind of impairment plaintiff has, but is not evidence that plaintiff has no impairment at all.   Dr. Ostrander recognizes some mental impairment in plaintiff, but finds it more likely to be related to psychiatric disorder such as depression than a learning disability such as dyslexia.  In many circuits, depression is a valid impairment.  See, e.g., Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 20 (1st Cir. 2004); Ogborn v. United Food & Commercial Workers Union, Local No. 881, 305 F.3d 763, 767 (7th Cir. 2002) ("Major depression can constitute a disability under the ADA."); Snead v. Metro.

Prop. & Cas. Ins. Co., 237 F.3d 1080, 1088 n.8 (9th Cir. 2001) ("In Oregon, stress and

depression can be considered mental impairments. The same is true under the ADA."); Pritchard

v. Southern Co. Servs., 92 F.3d 1130, 1132 (11th Cir. 1996), amended in part on reh'g, 102 F.3d

1118, cert. denied, 520 U.S. 1274 (1997) ("Depression has been held to constitute a mental

impairment."); Doe v. Region 13 Mental Health-Mental Retardation Comm'n., 704 F.2d 1402,

1408 (5th Cir.1983) (same).  Therefore, the reports of Dr. Newman and Dr. Ostrander both

provide evidence that plaintiff is mentally impaired under the ADA.  A reasonable fact finder

could only conclude that plaintiff suffers from some kind of mental impairment.


*b.  Substantially limits a major life activity*

        While plaintiff has offered un-rebutted evidence of a mental impairment, she has not

offered un-rebutted evidence of the nature of her impairment, and therefore she cannot show, for

summary judgment purposes, that she is substantially limited in a major life activity.  Some

people with dyslexia and major depression may be substantially limited, but others with short-

term depression related to the momentary ups and downs and stresses of life are not substantially

limited.  See Haynes, 392 F.3d at 483 (noting that to be a disability an "impairment's impact must

... be permanent or long term.") (citation omitted); Soileau v. Guilford of Me., Inc., 105 F.3d 12,

16 (1st Cir. 1997).  Lacking un-rebutted evidence of the nature of plaintiff's impairment,

summary judgment for plaintiff on the issue of disability is improper and must be denied.


        2.      Defendants' Motion for Summary Judgment

        To repeat, courts require an ADA plaintiff to (1) have an impairment (2) that is related to

a major life activity (3) and that substantially limits that major life activity.  Haynes v. Williams, 392 F.3d 478, 481-82 (D.C. Cir. 2004).  Defendants assume, for the purpose of argument on summary judgment, that plaintiff is impaired with the learning disabilities that Dr. Newman diagnosed and that plaintiff's impairment impedes the major life activity of learning.  They claim, however, that plaintiff is not substantially limited in that life activity.

Before considering defendant's arguments that plaintiff is not substantially limited in the major life activity of learning, we must have a better idea of the nature of the life activity of learning.  The parties, citing grades and scores back and forth, apparently have assumed that success or limitation in the major life activity of learning amounts to scoring above or below average on standardized tests and racking up high or low grades in high school and university classes.  Thus, the parties have reduced the activity of learning to the activity of test taking.  This is neither surprising or inappropriate, because, as one court has noted, "in the modern era, where test-taking begins in the first grade, and standardized tests are a regular and often life-altering occurrence thereafter, both in school and at work, I find test-taking is within the ambit of 'major life activity.'"  Bartlett v. N.Y State Bd. of Law Examiners, 970 F. Supp. 1094, 1117 (S.D.N.Y. 1997).  While mindful that at least one other court in an unpublished opinion has downplayed the importance of test-taking, Marlon v. Western New England College, No. 01-12199, 2003 WL 22914304, at *8 (D. Mass. Dec. 9, 2003) (finding that a plaintiff's impairments preventing her from writing for longer than 20 minutes at a time could not substantially limit her in learning when, to continue on in law school, she needed to take timed, four-hour written examinations), this court cannot take that view.  Tests are the gatekeepers to ever higher levels of learning, not just in the field of medicine, but in almost every field.  An inability to demonstrate competency

on tests due to a serious, longstanding impairment, such as plaintiff's dyslexia, could block an individual from attaining success in a variety of ways in both education and the workplace.  Cf. McGuinness v. U. of N.M. Sch. of Med., 170 F.3d 974, 978-79 (10th Cir. 1998) (holding that a mere anxiety associated with taking science tests that could be mitigated through study habits did not rise to an ADA disability and that such a subject-specific anxiety that apparently limited just one career, medicine, did not substantially limit the plaintiff's learning). Therefore, whether test-taking is itself a major life activity or a crucial component of the major life activity of learning, the court concludes that a plaintiff with an impairment that substantially limits her ability to perform on tests has an actionable ADA claim.

Returning to defendant's arguments that plaintiff is not substantially impaired in learning, defendants first argue that plaintiff has not demonstrated the substantiality of her situation because plaintiff's evidence does not demonstrate her limitation relative to the entire population, but relative to people of similar age and education.  Factually, defendants contend that Dr. Newman's tests show that plaintiff is impaired when compared with other college-educated people, but does not have any bearing on whether she is impaired when compared with the general population.  For instance, at least one of Dr. Newman's diagnostic tests, the Nelson-Denny, compared  plaintiff to other college-educated readers.  Legally, defendants cite the interpretive regulations of the Equal Employment Opportunity Commission (EEOC) and cases adhering to these regulations to support their position that an ADA plaintiff must be substantially limited when compared to the entire population.

The ADA does not define the term  "substantially limits" nor does the ADA give any agency the authority to issue a regulation defining that term.  Sutton, 527 U.S. at 479 ("No

agency . . . has been given authority to issue regulations implementing the generally applicable

provisions of the ADA, see §§ 12101- 12102, which fall outside Titles I-V.").  The Supreme

Court has only offered the straightforward advice that substantial means non-trivial.  <u>Toyota</u>

<u>Motor Mfg., Kentucky, Inc. v. Williams,</u>534 U.S. 184, 196 (2002).   Nevertheless, the EEOC has

published regulations and the defendants advance them as a reason for granting summary

judgment.  The regulations define "substantially limits" in two different contexts.  First, it

defines the term generically as it would relate to any number of  major life activities.  In this

context, the term means:

> (i) Unable to perform a major life activity that the average person in the general
> population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an
> individual can perform a particular major life activity as compared to the condition,
> manner, or duration under which the average person in the general population can
> perform that same major life activity.

29 .C.F.R § 1630.2(j)(1).  The regulation gives examples of major life activities: "caring for

oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and

working."  <u>Id.</u> § 1630.2(I).  Next, the regulation defines "substantially limits" as it would relate to

the specific major life activity of working:

> With respect to the major life activity of working . . . [t]he term substantially limits means
> significantly restricted in the ability to perform either a class of jobs or a broad range of
> jobs in various classes as compared to the average person having comparable training,
> skills and abilities. The inability to perform a single, particular job does not constitute a
> substantial limitation in the major life activity of working.

<u>Id.</u> § 1630.2(j)(3).  The Department of Justice has also published regulations.  The one pertinent

provision states that a person's substantial limitation should be in "comparison to most people."

28 C.F.R. pt. 36 app. B.  While our Circuit Court has indicated a willingness to follow such

regulations when the parties apparently raise no issue about their application, Haynes, the

Supreme Court has never held whether any deference is owed to these regulations.  Sutton, 527

U.S. at 480.

Whether following the regulations or not, defendants' proposition that an ADA plaintiff

claiming an impairment that limits her learning must be compared to the general population, the

entire population, is untenable for a number of reasons.

First, assuming these regulations are valid, these regulations do not require a comparison

to the general population in all cases.  As for the EEOC regulations, quite clearly, when an ADA

plaintiff claims a limitation in the major life activity of working, her limitation is assessed in

comparison to others of comparable training, skills, and abilities.  It is not surprising that the

EEOC, concerned with employment practices and empowered by Congress to issue some ADA

interpretive regulations in the employment context, see 42 U.S.C. § 12116, would offer a more

particular and detailed definition of "substantially limits" with respect to working while devising

a more generalized definition for other activities.  For many of the other listed activities, a

person's training, skills, and abilities are far less relevant to assessing whether that person is

substantially limited in that activity.  See Duncan v. WMATA, 240 F.3d 1110, 1121-22 (D.C.

Cir. 2001) (en banc) (Edwards, C.J., dissenting).  But see Wong v. Regents of the U, of Cal., 379

F.3d 1097, 1108 (9th Cir. 2004) (importing, without convincing analysis, the "entire population"

comparison requirement from the physical disability context to deny relief to a learning-impaired

medical student dismissed after receiving poor grades, discovering his impairment, and

requesting accommodations).  For example, whether a blind or deaf or paraplegic person has a

college degree is of no moment to assessing whether she is substantially limited as to seeing,

hearing, or walking.  In this respect, learning is more like working than other major life activities.  When learning, a person always finds herself amongst people with similar academic background.  In pre-school, children have almost no prior educational training.  At graduate school, at medical school, every student has a degree from a four-year college.  Students are generally compared to their peers on examinations, and that is how their substantial success or limitation in learning is measured.  Cf. Bartlett, 970 F. Supp. at 1126 (comparing plaintiff seeking bar exam accommodations to fellow law students when concluding that she is substantially impaired in activity of working as a lawyer).

Defendants would compare plaintiff, a graduate medical student, to a high school graduate or perhaps even a pre-school student to determine whether she is substantially limited in her ability to learn.  They would apply the general definition of "substantially limits" when the more specific definition, that for working which accounts for a person's training, is more applicable.  Using a more specific definition makes sense.  The EEOC regulations, therefore, do not require a plaintiff to show that she is substantially limited in learning compared to the rest of the world, but as compared to people of similar age and educational background.   The Department of Justice regulation is not at all inconsistent, advising that a comparison be made to "most people."  Most people is by no means all people, and the language's ambiguity would permit the agency or other entity to shape the appropriate comparison given the circumstance.

This interpretation of what the ADA and the agency regulations require is greatly supported by what the Supreme Court said about the ADA's coverage in Sutton v. United Airlines, 527 U.S. 471 (1999).  In Sutton, the court found, "critically," that the Congressional finding that 43 million Americans have one or more disability, enacted as part of the ADA,

showed that Congress intended the ADA to cover only those whose impairments remained

uncorrected, not all those with impairments.  527 U.S. at 484.  If the ADA were to cover those

with corrected conditions, the number of disabled would be about 160 million.  Id. at 487.

"Because it is included in the ADA's text, the finding that 43 million individuals are disabled

gives content to the ADA's terms, specifically the term 'disability.'  Id.  Describing the origins of

the 43 million figure, the court noted that the figure is most likely derived from the number of

people with activity limitations, which a Department of Health and Human Services report

described as "those who, relative to their age-sex group could not conduct 'usual' activities: e.g.,

attending preschool, keeping house, or living independently."  Id. 486-87.  Based on this

definition and based on the same logic the Supreme Court applied in Sutton, this court concludes

that it is appropriate when determining the existence of substantial limitation to look at a

person's age, sex, or other similar experiential factors that form the best basis of comparison.

    Putting the EEOC regulations and the 43 million figure aside, the ADA itself is silent

about the need for and the extent of any comparison.  The plain text of the ADA never speaks of

making a comparison; it speaks of substantial limitation.  To determine whether an individual is

limited no doubt requires some comparison, but the comparison ought to be meaningful and

possible.  Medical students. while in medical school, can only compare their test scores to their

fellow students and comparing them to members of the general population would be meaningless

if it could be achieved.

    Further, some courts are willing to go one step further, holding that evidence of a

disability can include the disparity between an individual's inherent abilities and his or her

performance in a testing situation "even if that individual's performance has met the standard of

the ordinary person." Pazer v. N.Y. State Bd. of Law Examiners, 849 F. Supp. 284, 287

(S.D.N.Y.1994). Evidence of a disparity could not compel the finding of a disability as a matter

of law, because many other factors besides the alleged impairment might be involved and, "to

hold otherwise would compel the conclusion that any underachiever would by definition be

learning disabled." Id. Rather, the finding of substantial impairment and disability would have

to depend on the credibility of witnesses and the evidence adduced. Compare id.; Gonzales v.

NBME, 225 F.3d 620 (6th Cir. 2000) (crediting defense expert), with Doe v. NBME, No.

C-99-3124 WHO, (N.D. Cal. 1999) (crediting plaintiff expert).

For all these reasons, the court holds that an ADA plaintiff can be substantially limited in

the major life activity of learning based on comparisons of her success to others of comparable

age and educational background. This is consistent with the Supreme Court's pronouncement

that "whether a person has a disability under the ADA is an individualized inquiry." Sutton,527

U.S. at 483. Plaintiff has not produced a mountain of evidence on this point, but Dr. Newman's

test data combined with plaintiff's assertion of difficulty and her record of failure on multiple

choice tests allows plaintiff to survive summary judgment on this point. Defendants certainly

cannot win summary judgment by pointing to the lack of data comparing plaintiff to the average

person in society; defendants must show that plaintiff's limitation is insubstantial on other

grounds.

That brings the court to defendant's second argument for summary judgment concerning

plaintiff's disability: plaintiff's prior academic history establishes that, far from being limited,

plaintiff has met with great success that should preclude her from claiming disability. Plaintiff

truly has had some academic success. Plaintiff graduated in the top four percent of her high

school class.  She won competitive chess tournaments as a youth in her native country of Guyana

and in the United States.  With tutoring, she received a 760 out of 800 on the mathematics

section and 550 out of 800 on the verbal section of the SAT.  New York University admitted her

to its undergraduate program and she matriculated at the age of 16.  While obtaining B's and C's

in science classes, she did much better in her other courses.  Plaintiff accomplished all this

without accommodations or discovering her impairment.

As discussed above, the mere fact the plaintiff was, before medical school, generally

successful as compared to all of America is not the important question.

Rather, the important question is whether this record demonstrates that plaintiff is not

substantially limited in her ability to learn.  Based on plaintiff's claimed limitation, that she is

limited in learning by her inability to succeed at  timed multiple choice tests, plaintiff's previous

academic success does not help defendants because plaintiff's previous success had little to do

with her ability to take multiple choice tests.

Plaintiff's factual evidence of her claimed limitation is not contested by defendants.

During her diagnostic meetings with Dr. Newman, plaintiff recounted that she was having

particular difficulty with multiple choice tests and had failed a number of multiple choice exams

during her time at the School..  In contrast, she has tended to perform better on other exam

formats, such as demonstrations and presentations.  (Pl. Mot. Exh. 2, pp.1, 6.)  Further, plaintiff

told Dr. Newman that she had rarely encountered timed multiple choice tests before coming to

medical school.  Id. at 7.  On the most infamous timed multiple choice test, the SAT, plaintiff

fared much worse on the verbal section, receiving a 550 out of 800 on that portion of the test but

a 760 out of 800 on the mathematics portion.  Dr. Newman stated that the lower verbal score was

16

below expectation and inconsistent with plaintiff's verbal intelligence.  (Pl. Exh 7, p. 54.)

Given all this, the court finds there is a genuine issue about whether, assuming plaintiff has the learning disabilities diagnosed by Dr. Newman, she is substantially limited in the major life activity of learning.  Again, summary judgment for defendants must be denied.


3.      Conclusion

Though the court has denied both parties' motions for summary judgment on the issue of disability, the court will assume that plaintiff is disabled so that, in the interest of judicial economy, it may go on to consider the parties' further arguments concerning whether plaintiff has or has not established the other elements of her ADA claim.  Federal Rule of Civil Procedure 56(a) and 56(d) contemplate a partial summary adjudication as to elements of a claim.  Fed. R. Civ. P. 56(a)("A party seeking to recover upon a claim . . . may . . . move for a summary judgment in the party's favor upon all or any part thereof."); id. R. 56(d)("If judgment is not rendered upon the whole case  . . .  the court  . . . shall if practicable ascertain what material facts exist without substantial controversy and . . . [u]pon the trial of the action the facts so specified shall be deemed established.").  See, e.g., Rotorex Co., Inc. v. Kingsbury Corp., 42 F. Supp. 2d 563, 570-71 (D. Md. 1999); France Stone Co. v. Charter Township of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992); cf. United States v. Philip Morris, 316 F. Supp. 2d 13 (D.D.C. 2004).


B.      Otherwise qualified

"A handicapped or disabled person is 'otherwise qualified' to participate in a program if she can meet its necessary requirements with reasonable accommodation." Kaltenberger v. Ohio

College of Podiatric Medicine, 162 F.3d 432, 435 (6th Cir. 1998). Plaintiff's undisputed

evidence shows that she is otherwise qualified to be a medical student at the School.  Dr.

Newman has concluded that plaintiff could satisfy the School's academic standards with certain

accommodations.  In her diagnostic report, Dr. Newman stated that she had the "strong belief that

[the plaintiff] deserves the opportunity to finish her medical studies with the appropriate

accommodations."  (Pl. Exh. 2, p. 7.)  Some of these accommodations would include double time

on exams, being allowed to record lectures, and being allowed to use a laptop for essay exams.

Id.  During her deposition, Dr. Newman, when asked whether "with the accommodations . . .

Carolyn Singh is quite capable of graduating from George Washington Medical School and

completing her courses satisfactorily?," answered, "yes."  (Pl. Exh. 7, pp. 92-93.)

Defendants assert that plaintiff is not otherwise qualified because she has not, to date,

performed up to the School's academic standards.  Yet plaintiff never benefitted from

accommodations at the School, and therefore her record at the School tells us nothing about how

she would perform with accommodations.  Meanwhile, plaintiff offers evidence that she could

succeed with accommodations.   Defendants neither counter this assertion nor offer evidence that

the accommodations suggested are unreasonable.  To the contrary, defendants' expert Dr.

Ostrander, while not able to make conclusions about whether plaintiff could succeed in medical

school admits that Dr. Newman's accommodations are reasonable.  (Def. Exh. 4, p. 13.)

Defendants' only other contention is that the MSEC decided to recommend the dismissal

of plaintiff on neutral grounds before anyone at the School learned of Dr. Newman's report, that

the Dean accepted this decision, and that court should defer to this determination by the School

that plaintiff was not otherwise qualified.  See Wynne, 932 F.2d at 27-28.  Reasonable deference

is one thing, blind deference another.  Deferring to a university's academic assessment may make

sense.  Here, however, the MSEC never considered evidence of plaintiff's learning disability and

never, as the university in <u>Wynne</u>, made a decision that accommodation would be unreasonable

or otherwise inappropriate.  The Dean, then, acted on the MSEC's decision without considering

plaintiff's disability.  The School never undertook "a diligent assessment of the available

options," <u>Wynne v. Tufts School of Med.</u>, 976 F.2d 791, 795 (1st Cir. 1992), and never made "a

professional, academic judgment that reasonable accommodation is simply not available."

<u>Wynne I</u>, 932 F.2d at 27-28.  The court sees no reason to defer to the MSEC's decision when its

decision was made without evidence or knowledge of plaintiff's disability.  <u>Cf.</u> <u>Falcone v. Univ.</u>

<u>of Minn.</u>, No. 01-1181, 2003 U.S. Dist. LEXIS 15787, at *26-27 (Sep. 3, 2003).

Therefore, summary judgment on this point is granted to plaintiff and denied to

defendants.


C.    <u>Discrimination</u>

The ADA protects against various kinds of discrimination.  At issue in this case are two

types of discrimination: the denial of an opportunity on the basis of a disability and the failure to

make a reasonable modification to a policy or a procedure.

First, the ADA makes it "discriminatory to subject an individual or class of individuals on

the basis of a disability . . . to a denial of the opportunity . . . to participate in or benefit from the

goods, services, facilities, privileges, advantages, or accommodations of an entity."  42 U.S.C. §

12182(b)(1)(A)(i).  Plaintiff cannot claim this kind of discrimination.  The School did not

dismiss plaintiff "on the basis of a disability."   See Brantly v. Indep. Sch. Dist. No. 625, 936 F.

Supp. 649, 657 (D. Minn. 1996).  Rather, the MSEC evaluated plaintiff's academic performance

without knowing that she was disabled and the Dean treated her like each of the 11 other student

the MSEC had recommended for dismissal: he dismissed her.

> A second kind of ADA discrimination occurs when a public accommodation fails:

> to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations

42 U.S.C. § 12182(b)(2)(A)(ii); see PGA Tour, Inc. v. Martin, 532 U.S. 661, 682 (2001).  By

letter dated February 26, 2003, plaintiff presented to Dean Williams the Dr. Newman evaluation

and requested two modifications of the School's practices or policies.  First, plaintiff wanted the

Dean to have the MSEC reconsider its dismissal recommendation or, alternatively, plaintiff

wanted the Dean to reconsider the MSEC's decision and permit plaintiff to continue her studies.

Second, plaintiff wanted the testing and other accommodations that Dr. Newman had

recommended in her report.

For their part, defendants first argue that they had no obligation to provide either

modification because plaintiff had failed to request the modifications in time – that is, before

dismissal.  This Circuit has held in the employment context that the ADA prohibits only

discriminatory acts performed "with an awareness of the disability itself and not merely an

awareness of some deficiency in the plaintiff's performance that might be a product of an

unknown disability." Crandall v. Paralyzed Veterans of America, 146 F.3d 894, 897 (D.C.

Cir.1998).  Along these lines, while a university has no obligation to readmit a dismissed student who later learns of a disability, Ferrell, 1999 WL 1581759, at *3, and while an university need not accommodate a student undergoing testing for a disability or a student who only thinks she is disabled, Kaltenberger, 162 F.3d at 437, a university does have an obligation once it learns that a student is disabled, Wynne v. Tufts School of Med., 976 F.2d 791, 795 (1st Cir. 1992).

Here, the School's own regulations doom its timeliness argument.  The regulations require that the School communicate all decisions of dismissal in a writing that sets forth reasons for the action.  The only writing that fulfilled this requirement was Dean Williams' letter of March 5, 2003.  Meanwhile, it is undisputed that Dean Williams received and read plaintiff's request for accommodation and Dr. Newman's report on or about February 26 and, in any event, prior to March 5.  The School's contention that Dean Williams dismissed plaintiff orally on February 11 is vigorously disputed, and even if it were true, an oral dismissal simply does not fulfill the requirements of academic dismissal set forth in the School's own regulations.  Therefore, plaintiff's request was timely.

Defendants next argue that the modifications that plaintiff requests are unreasonable because they amount to a request for a second chance.  Some courts have admonished that the ADA requires reasonable modifications, but not second chances.  Under this "no second chance" banner, courts have held that for a student or worker who cannot perform satisfactorily even when accommodated and gets terminated as a result, the reversal of the termination decision would not be a reasonable modification.  See, e.g., Bugg-Barber v. Randstad US, L.P., 271 F. Supp. 2d 120, 131 (D.D.C. 2003).  Courts have also held that for a person who cannot control the

effects of his or her disability and gets terminated as a result, the reversal of the termination

decisions would likewise not be a reasonable modification.  See, e.g., Siefken v. Village of

Arlington Heights, 65 F.3d 664 (7th Cir. 1995) (holding that a diabetic police officer was

properly terminated when he suffered a diabetic reaction on the job and drove his car erratically

and at high speeds through residential areas); accord Hill v. Kansas City Area Transp. Auth., 181

F.3d 891 (8th Cir. 1999).  The second chance doctrine, in so far as it is a doctrine, works to deny

already accommodated and at-fault plaintiffs from winning an endless string of new

accommodations after each failure.  The doctrine does not apply to plaintiffs who, through no

fault of their own, have not yet had a chance to get the modifications they need.  See Dudley v

Hannaford Bros. Co., 333 F3d 299 (1st Cir. 2003).

In Dudley, the First Circuit found that a second chance – a reconsideration of a decision –

could be required under the ADA.  Plaintiff Dudley suffered severe injuries during a car crash.

He never fully recovered, and his disabilities included "severely impaired speech, a pronounced

loss of muscular control, an inability to take even breaths, and a tendency toward impulsive

mood swings."  333 F.3d at 301.  These disabilities made Dudley appear drunk.  Defendant food

store had an unwritten  policy that cashiers should not sell alcohol to people they deem drunk and

a policy that management would never reconsider a cashier's decision not to sell.  Id. at 302.

One evening, Dudley attempted to purchase alcohol at the food store.  The cashier refused to sell

the alcohol to Dudley and the manager, relying on the store policy, refused to reconsider the

cashier's decision.  Id.  The First Circuit held that requiring an exception or modification to the

store's refusal to reconsider policy for disabled people was reasonable and necessary given the

policy's discriminatory effect, and the court upheld the district court's injunction requiring the store to abandon its refusal to reconsider policy.  Id. at 308-11.

The facts of this case fit far more comfortably within the Dudley framework than within the framework of the typical "no second chance" cases.  The School had a de facto policy of not reviewing MSEC dismissal decisions.   In each of 11 cases during the Dean's tenure when the MSEC recommended dismissal, the Dean followed that recommendation.  In this particular case, the Dean, though he read plaintiff's disability report, gave it no weight in his decision to adopt the MSEC recommendation.  He says that his decision was based on plaintiff's poor academic performance, that he had not agreed to defer decision until the disability report was finished, and that he was adopting the recommendation of the MSEC, which was made before anyone knew of plaintiff's disability.   Plaintiff's request that the MSEC or Dean reconsider the initial MSEC decision was made as soon as she learned of her disability.  Plaintiff had been unaware of her disability throughout her academic career and through medical school.  Plaintiff's medical school failures, then, occurred while she was not accommodated in any way.  She does not seek a second chance to monitor her disability or a new set of accommodations.  Plaintiff seeks a first chance to successfully handle her disability.  Actually, all she sought was to have the School consider her disability before dismissing her.   Plaintiff's request for reconsideration, like Dudley's, is a reasonable request for a modification.

Defendants do not otherwise dispute the reasonableness of the request for reconsideration, which plaintiff needed in order to have a chance to stay at the School. Furthermore, as discussed earlier in Part III.B, the evidence demonstrates that the

accommodations outlined in Dr. Newman's report, which would put plaintiff on equal footing in her learning and testing, were reasonable. For all these reasons, summary judgment on whether the actions in this case constituted discrimination is granted to plaintiff and denied to defendants.

    D.    <u>Proper Parties</u>

Defendants also argue that the individual defendants, Williams and Goldberg, are not proper defendants in this case. Under Title III of the ADA, as under Titles I and II, institutions, not their employees, are the ones who own, lease, or operate places of public accommodation and are therefore subject to ADA liability. <u>Emerson v. Thiel College</u>, 296 F.3d 184, 189 (3d Cir. 2002); <u>see</u> <u>also</u> <u>Coddington v. Adelphi U.</u>, 45 F. Supp. 2d 211, 217 (E.D.N.Y. 1999); <u>Walker v. Snyder</u>, 213 F.3d 344, 346 (7th Cir. 2000) ("[T]he ADA addresses its rules to employers, places of public accommodation, and other organizations, not to the employees or managers of these organizations."). It is "the institution has the power to make accommodations and thus it operates the place of public accommodation and is the proper defendant." <u>Coddington</u>, 45 F. Supp. 2d at 217. This result is eminently reasonable in cases such as this where plaintiff seeks only injunctive relief. If the institution, not the individuals, has the power to accommodate, only an injunction directed at the institution will provide the relief sought.

Therefore, the court will dismiss the complaint as to defendants Williams and Goldberg.

    E.    <u>Counterclaim</u>

In this case, Dean Goldberg, while a named defendant, filed a counterclaim against

plaintiff for defamation.   The counterclaim is for defamation, a state law tort.  There is no basis

for this court to exercise original subject matter jurisdiction over such a claim.  Nevertheless,

even when a court lacks original subject matter jurisdiction, a court may still elect to hear a claim

if the court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  The statute provides

that:

> in any civil action of which the district courts have original jurisdiction, the district courts
> shall have supplemental jurisdiction over all other claims that are so related to claims in
> the action within such original jurisdiction that they form part of the same case or
> controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).  Article III requires that related claims share a "common nucleus of

operative facts."  Doe v. District of Columbia, 93 F.3d 861, 871 (D.C. Cir. 1996) (quoting

United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966)); Cormier v. Funtown/Splashtown

USA, Inc., 294 F. Supp. 2d 125 (D. Me. 2003).

        In Cormier, the court held that an employer's counterclaims of breach of fiduciary duty,

violation of confidential relations, conversion, slander and libel, and failure to pay debts, did not

arise out of a common nucleus of operative fact with the employee's Title VII discrimination

claim.  The court therefore dismissed the counterclaims for lack of subject matter jurisdiction.

Cormier, 294 F. Supp. 2d at 131.

        Here, as in Cormier, plaintiff's discrimination claim concerning the School's failure to

provide accommodations has almost no factual or legal overlap with Dean Goldberg's

defamation claim.  Evidence showing or disproving plaintiff's disability, her ability to otherwise

succeed in medical school, and failure to accommodate – the elements of the ADA claim –

would offer no insight into whether plaintiff harmed Dean Goldberg by allegedly publishing

defamatory statements.  Therefore, the court must dismiss Dean Goldberg's counterclaim.

The court also notes that as of the entry of this order, Dean Goldberg is no longer a

defendant in this case.  As one court explained:

> the word "counterclaimant" presupposes that the person so described be a "defendant."
> Inasmuch as [a former defendant] is no longer a defendant, he cannot be a
> counterclaimant. His counterclaim, if not mooted by his elimination as a defendant, is
> hereby DISMISSED with prejudice.

Oladeinde v. City of Birmingham, 118 F. Supp. 2d 1185, 1194 (N.D.Ala. 1998) (quoting

Oladeinde v. City of Birmingham, CV 91-AR-196-S, Memo.Op. at 1-5 (N.D.Ala. Apr. 30,

1993)).  This serves as an additional rationale for dismissing Dean Goldberg's counterclaim.


IV.    CONCLUSION AND ORDER


For the foregoing reasons, it is hereby

ORDERED that plaintiff's unopposed motion [22] to amend the scheduling order is

GRANTED nunc pro tunc and plaintiff's summary judgment motion is deemed timely filed;

ORDERED that the parties' cross motions [21 and 25] for summary judgment are

GRANTED IN PART and DENIED IN PART.  Both motions are denied on the issue of whether

plaintiff has a disability.  The plaintiff's motion is granted and defendants' motion is denied on

the issues of whether plaintiff was otherwise qualified and whether the defendants discriminated.

That plaintiff's claims as to defendants Williams and Goldberg are DISMISSED WITH

PREJUDICE, and that Dean Goldberg's counterclaim is DISMISSED WITHOUT PREJUDICE.

ORDERED that defendants' motion [30] to strike portions of plaintiff's reply is

DENIED;

ORDERED that plaintiff's unopposed motion [33] for leave to file affidavit is

GRANTED; and

ORDERED that plaintiff's motion [29] for extension of time to file answer and motion

[37] for leave to file are both DENIED AS MOOT, given that Dean Goldberg's counterclaim has

been dismissed.

SO ORDERED.

Signed by Royce C. Lamberth, United States District Judge, March 22, 2005.