### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CAROLYN SINGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 03-1681 (RCL) |
| GEORGE WASHINGTON | ) | |
| UNIVERSITY SCHOOL OF | ) | |
| MEDICINE AND HEALTH | ) | |
| SCIENCES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case comes to the Court on remand from the Court of Appeals. *See Singh v. George Washington Univ. Sch. of Med. & Health Scis.*, 508 F.3d 1097 (D.C. Cir. Dec. 4, 2007). This revised opinion does not modify the original judgment in the case, *see Singh v. George Washington Univ. Sch. of Med. & Health Scis.*, 439 F. Supp. 2d 8 (D.D.C. 2006) (Lamberth, J.); rather, in accordance with the Circuit's instructions, it corrects and clarifies the reasoning that led to the original conclusion.

This case originates from a dispute between a former medical student, plaintiff Carolyn Singh, and the medical school that dismissed her from its program, defendant the George Washington University School of Medicine and Health Sciences ("GW"). Plaintiff claims that GW dismissed her because of her disabilities in violation of the Americans with Disabilities Act, 42 U.S.C. § 12182(a) (2000) ("ADA"). Plaintiff initially named as additional defendants two administrators of the medical school, but this Court dismissed the complaint as to those two defendants in *Singh v. George Wash. Univ., et al.*, 368 F. Supp. 58, 72-73 (D.D.C. 2005)

(Lamberth, J.).  In so doing, this Court disposed of the parties' pretrial cross-motions [21, 25] for summary judgment by granting and denying each in part.  *Id.* at 73.

The parties appeared before this Court for a non-jury trial on November 21-23, 2005. Each party presented several witnesses and a number of exhibits.  At the Court's direction, each party submitted Proposed Findings of Fact & Conclusions of Law [62, 63] on April 5, 2006.

Based on all of the evidence presented, the Court makes the following findings of fact and conclusions of law and will, consistent with them, enter judgment in favor of defendant and against plaintiff.

## FINDINGS OF FACT

1.      Ms. Singh's educational history reveals many academic achievements, along with some instances of poor performance.

      (a)      Ms. Singh was born in Guyana, South America.  (Trial Tr. 11/21/05 at 13.) She learned to read at age three.  (Trial Tr. 11/22/05 at 187-88.)  At a young age, she became a highly-ranked competitive chess player.  (Trial Tr. 11/21/05 at 15.)

      (b)      After moving to New York, her scores on a placement test earned her a spot in the tenth grade at James Madison High School.  (Trial. Tr. 11/21/05 at 16-17.)  She graduated from high school at age sixteen.  (*Id.* at 17.)

      (c)      Throughout her educational career, Ms. Singh remembers struggling with classes that involved reading (*id.* at 13-16) and says that she "never liked reading" (*id.* at 13).  She describes how she found ways to avoid the

reading required in English courses, such as relying on material learned

from class discussions, skimming the assigned books (*id.* at 16), or

avoiding the course altogether (Trial Tr. 11/21/05 at 18).

(d)     In addition to her perceived difficulties with reading, Ms. Singh reports

that she typically performed more poorly on multiple-choice timed tests

than her grades would indicate.  (*Id.* at 19, 25, 27, 35-38.)  As a result, she

also attempted to avoid courses that involved multiple-choice tests.  (*Id.* at

31-34.)

2.     Ms. Singh was a student at GW medical school from the fall of 2000 until the

spring of 2003.  She was a student in the decelerated program, in which the first

year of medical school courses are taken over two years.  (Trial. Tr. 11/23/05 at

322-23.)  Upon completion of the first year coursework, decelerated program

students enter the regular Doctor of Medicine program for the remaining three

years.  (*Id.* at 341.)

3.     To attain and remain in academic good standing, decelerated students must not

only achieve a passing grade in their courses, but their grades must also be within

one standard deviation from the class mean in courses of three or more credits.

(*Id.* at 323.)

4.     Students who receive an inadequate grade in a course are at risk of academic

dismissal.  (*Id.* at 323.)  The dean may require the student to appear before the

Medical Student Evaluation Committee ("MSEC").  (*Id.* at 329.)  The MSEC then

makes a recommendation to the dean as to whether the student should be

3

dismissed at that time.  (Trial Tr. 11/23/05 at 329.)  Once a student has been placed at risk of academic dismissal, he or she remains in that posture, regardless of whether or how the MSEC took action.  (*Id.* at 336.)

5.    Ms. Singh struggled academically at the school.  (*Id.* at 398.)  In particular, she performed poorly on some of the multiple-choice timed exams used to assess students' progress in many courses.

(a)    Plaintiff failed one of the two courses she took in her first semester, Fall 2000.  (Trial Tr. 11/21/05 at 36.)  The failing grade, in Cells & Tissues, was based solely on her performance on a multiple-choice exam.  In the spring 2001 semester, plaintiff passed both courses in which she was enrolled, but her grade in one of them fell below the standard deviation requirement.  (*Id.* at 91.)  Although falling below the standard deviation placed Ms. Singh at risk of academic dismissal, the dean did not require her to appear before the MSEC.  (Trial Tr. 11/23/05 at 333-34.)  She was, however, required to retake, over the summer, the course she failed in the fall 2000 semester.  (*Id.* at 334.)

(b)    In the fall 2001 semester, Ms. Singh enrolled in two courses.  (Trial Tr. 11/21/05 at 92.)  She failed one of them and fell below the standard deviation in the other.  (*Id.*)  Because each event placed her at risk of academic dismissal, she was required to appear before the MSEC.  (Trial Tr. 11/23/05 at 336.)  Ms. Singh told the MSEC that she failed the course because of errors in marking her answer sheet.  (Trial Tr. 11/21/05 at 93.)

She also said that the September 11 terrorist attacks had adversely affected her performance. (*Id.*) The MSEC's recommendation, in which Dr. John Williams, then the dean of the medical school, concurred, was that plaintiff remain in the program provided that she retake the failed course over the summer. (*Id.* at 94.)

(c)     Plaintiff passed the two courses she took in Spring 2002, but she fell below the standard deviation requirement in one. (*Id.*) Although that placed her at risk of academic dismissal, she was not required to appear before the MSEC. (*Id.* at 95.)

(d)     In the Fall 2002 semester, two years after plaintiff entered GW, she began to take the regular medical school courseload. (Trial Tr. 11/23/05 at 340-41.) In addition to five medical school courses, Ms. Singh enrolled in a two-credit undergraduate piano course. (Trial Tr. 11/21/05 at 95-97.) She failed one of her courses and received a conditional grade in another. (*Id.* at 97, 99.) As that placed her at risk of academic dismissal, she appeared before the MSEC on January 16, 2003. (*Id.* at 99.) The MSEC recommended that Ms. Singh be dismissed for academic reasons. (*Id.* at 101.)

6.     Throughout her struggles in medical school, Ms. Singh received advice and consultation from numerous sources on how she might improve her performance.

(a)     Rhonda M. Goldberg, the Associate Dean for Student Affairs, suggested to Ms. Singh that she should reduce her involvement in extracurricular

activities.  (Trial Tr. 11/23/05 at 346, 360-63.)

(b)    Upon the advice of Associate Dean Goldberg (*id.* at 337-38), Ms. Singh visited the University's Counseling Center, where she completed a self-assessment to identify areas for improvement (*id.* at 372).  Based on the results, plaintiff was referred to self-help materials and handouts.  (*Id.* at 377-78.)  The counseling center encouraged Ms. Singh to return to discuss her progress, and twice attempted to follow up with her.  (*Id.*)  Plaintiff, however, never responded or returned to the center.  (Trial Tr. 11/23/05 at 378.)

(c)    Ms. Singh told the associate director of the counseling center, Dr. Davis, that she often listened to—and sang along with—music while studying, even though she knew it interfered with her retention of the material.  (*Id.* at 368.)

(d)    Ms. Singh also told Dr. Davis that she was involved in a number of extracurricular activities.  (*Id.* at 369-70.)

(e)    After being called before the MSEC in January 2003, Ms. Singh began to suspect that she might have a learning disability, and visited the University's center for disability support services.  (Trial Tr. 11/21/05 at 43.)  The center referred her to several specialists who could test her for disabilities.  (*Id.* at 44.)

7.    At Dean Williams' request, Ms. Singh met with him on February 11, 2003.  (Trial Tr. 11/21/05 at 101; Trial Tr. 11/23/05 at 393-94.)  At the meeting, he

6

communicated his decision to dismiss her from the program. (Trial Tr. 11/23/05 at 395-96, 398.) Plaintiff advised the Dean that she was awaiting the results of disability testing, but Dean Williams told her that the results would not affect his decision. (*Id.* at 395-96.)

8.      On February 4, 5, 10 and 19, Ms. Singh met with Dr. Anne C. Newman for testing to determine whether she had any learning disabilities. (Pl.'s Tr. Ex. 1.)

    (a)      Dr. Newman is a clinical psychologist. She devotes approximately half of her caseload to diagnosing and treating young adults with learning disabilities. (Trial Tr. 11/22/05 at 145.)

    (b)      Dr. Newman interviewed and tested plaintiff. While she reported that Ms. Singh was distressed about her academic troubles, Dr. Newman did not conclude that plaintiff was so depressed that her test results would be affected. (*Id.* at 150, 205-06.)

    (c)      Upon completion of plaintiff's testing, Dr. Newman prepared a report summarizing her findings. Her revised[1] report concluded that Ms. Singh suffered from two learning disabilities: reading disorder (dyslexia), and a mild disorder of processing speed. (Pl.'s Tr. Ex.1.)

    (d)      Based on the learning disabilities Dr. Newman identified, she recommended that plaintiff receive a number of accommodations: double

---

[1] Dr. Newman initially diagnosed plaintiff with three disabilities: reading disorder (dyslexia), mild disorder of processing speed and a disorder of phonological awareness. (Pl.'s Tr. Ex. 1.) Subsequently, however, she discovered an error in her scoring, and upon correction, concluded that plaintiff suffered from only two of the three disabilities initially diagnosed: dyslexia and the processing speed disorder. (Trial Tr. 11/22/05 at 152-53, 165-66, 192.)

time on examinations, use of a reader for exams to fill in answer sheets on

tests, tape recordings of lectures, access to professors' or students' notes,

and use of a laptop for essay exams.  (Trial Tr.11/22/05 at 176-77.)

    (e)    Dr. Newman explained that Ms. Singh's disorders affected her test-taking

ability because they caused plaintiff to read more slowly and with great

effort.  (*Id.* at 192, 446.)  These symptoms manifested themselves more

prominently on multiple choice tests because of the time pressure and the

lack of context provided in the test questions.  (*Id.* at 156.)

9.    Dean Williams received Dr. Newman's report on or about February 26.  (Trial Tr.

11/23/05 at 402.)  He concedes that, while he did read it, it had no effect on his

decision to dismiss plaintiff for academic reasons.  (*Id.* at 404.)  He wrote plaintiff

a letter dated March 5, 2003, dismissing her from the school.[2]  (*Id.* at 399.)

## CONCLUSIONS OF LAW

### I.  Legal Standard

Plaintiff claims that GW's failure to offer reasonable accommodations before dismissing

her constitutes discrimination in violation of § 12182(a) of the ADA.  That section provides:

> No individual shall be discriminated against on the basis of disability
> in the full and equal enjoyment of the goods, services, facilities,
> privileges, advantages, or accommodations of any place of public
> accommodation by any person who owns, leases (or leases to), or
> operates a place of public accommodation.

---

[2] This Court already found that the actual dismissal of plaintiff occurred when the letter was sent. *Singh*, 368 F. Supp. 2d at 70. According to GW's own regulations, any decision communicated orally cannot be deemed an official dismissal. *Id.* Accordingly, this Court already determined that plaintiff's request for accommodations— because it was received before Dean Williams' letter was sent—was timely. *Id.* Accordingly, as to the obligation to provide reasonable accommodations, it is irrelevant whether Dean Williams communicated to plaintiff at the meeting that his decision was final.

42 U.S.C. § 12182(a).

As this Court previously noted, *Singh*, 368 F. Supp. 2d at 62, to establish a violation of this provision, plaintiff must demonstrate "(1) that she has a disability; (2) that she is otherwise qualified for the benefit in question; and (3) that she was excluded from the benefit due to discrimination because of the disability." *Kaltenberger v. Ohio College of Podiatric Med.*, 162 F.3d 432, 435 (6th Cir. 1998); *cf. Ferrell v. Howard Univ.*, Civ. A. No. 98-1009, 1999 WL 1581759, at *3 (D.D.C. 1999), *aff'd,* 254 F.3d 315 (D.C. Cir. 2000).

This Court reviews the evidence under a preponderance standard. *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999). When this Court considered the parties' summary judgment motions, it resolved the dispute as to two of the three factors. First, it held that "[p]laintiff's undisputed evidence shows that she is otherwise qualified to be a medical student" at GW. *Id.* at 18. Second, it determined that plaintiff could not claim that GW had discriminated against her by dismissing her because of her disability. Rather, this Court held that plaintiff's only claim that she had been discriminated against was based on GW's failure to provide accommodations[3] to her once they learned of her disability. *Id.* at 19-21. In so ruling, this Court held that plaintiff's request for accommodations was timely, and that the "second chance" doctrine did not defeat her claims. *Id.* at 21.

---

[3] As this Court previously explained, *Singh*, 368 F. Supp. 2d at 69-70, discrimination occurs under the ADA's accommodation clause when a defendant fails

> to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii).

In light of the foregoing, the only issue remaining for this Court to determine is the existence and nature of the disability itself.  Indeed, this Court previously noted that while plaintiff had demonstrated (sufficient to withstand summary judgment) that she had some kind of impairment, whether it was a disability for purposes of the ADA had not been established. *Singh*, 368 F. Supp. 2d at 63.  To show that she has a disability for purposes of the ADA, plaintiff must prove that "(1) [s]he suffers from an impairment; (2) the impairment limits an activity that constitutes a major life activity under the Act; and (3) the limitation is substantial." *Haynes v. Williams*, 392 F.3d 478, 481-82 (D.C. Cir. 2004) (citing § 12102(2)(A) of the ADA and construing its language that a protected disability is "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual").  The Court already held that plaintiff had an impairment of some sort, whether it be a learning disability, as plaintiff contends, or depression, as defendant believes.  *Singh*, 368 F. Supp. 2d at 63. Accordingly, the remainder of these Findings of Fact & Conclusions of Law shall be limited to discussing the only remaining issue: whether plaintiff's impairment substantially limits a major life activity.  If it does so, then it is a disability under the ADA.

## II. Analysis

Based on the evidence presented at trial, this Court does not find that plaintiff has a disability as defined by the ADA and case law.  This conclusion is compelled by the academic success she has enjoyed throughout her life, including her strength from a very young age in areas that require reading and comprehension under time pressure, such as reading and general coursework.  Had she the ADA-defined disability that she claims to have, her achievement should have been more consistently limited.  Plaintiff was a student in competitive educational

environments—she took a competitive courseload of college preparatory courses at a top high

school, and an even more competitive courseload of pre-medical classes at a top undergraduate

institution—and performed extremely well in almost every subject.  While this Court accepts that

a reading disability could affect plaintiff's ability to complete time-pressured multiple choice

exams, it does not find that her enormous success in other reading and comprehension

tasks—undoubtedly some of them timed—is consistent with a reading disorder which primarily

manifests itself in limiting her reading speed.  Again, for plaintiff's impairment to constitute a

disability under the ADA, it must result in substantial limitation of a major life activity.  Plaintiff

has not established such substantial limitation.  To the contrary, plaintiff appears quite able to

succeed in the major life activity of learning.

A.      The Relevant "Major Life Activity" is "Learning."

        For plaintiff to prevail, she must prove that she is substantially limited, compared to the

average person,[4] in the major life activity of learning.  It would not be enough to prove that she is

substantially limited in some related sub-activity, such as test-taking.  Substantial limitation of a

sub-activity is only relevant to the extent that it limits the major life activity of learning in

general.[5]  Plaintiff claims that she suffers from some limitation in her ability to take time-limited

---

[4]The Court of Appeals noted that this Court, in its earlier opinion denying summary judgment, set forth the wrong standard for assessing whether plaintiff is substantially limited in the major life activity of learning.  This Court held that "an ADA plaintiff can be substantially limited in the major life activity of learning based on comparisons of her success *to others of comparable age and educational background*."  368 F. Supp. 2d at 67 (emphasis added).  That holding was an extension of the EEOC's regulations regarding the major life activity of "working."  The Court of Appeals' opinion disapproved of this extension.  508 F.3d at 1100–04.  The proper standard for the major life activity of "learning," as reflected in the accompanying text, assesses whether plaintiff is substantially limited compared *to the average person*.  However, this standard is not integral to the rest of this opinion because, as explained below, plaintiff failed to demonstrate that any such limitation is the result of her impairment.

[5]This distinction reflects the clarification provided by the Court of Appeals.  508 F.3d at 1104.

tests.  However, this Court need not decide whether this limitation amounts to a substantial

limitation in the major life activity of learning because plaintiff has not shown that her limitation

is a result of her impairment (whether a learning disability or depression).

B.      *There Are Numerous Possible Reasons for Plaintiff's Claimed Test-Taking Limitation.*

      Assuming that plaintiff's test-taking limitation is genuine, there are many reasons aside

from plaintiff's impairment that might explain why plaintiff has done relatively poorly on

extremely time-limited tests.  Perhaps she feels undue pressure that makes it difficult to

concentrate on complex concepts.[6]  Perhaps she finds herself unable to pay attention to detail and

avoid making errors in marking her answer sheet.  Perhaps her involvement in extra-curricular

activities prevented her from dedicating sufficient time and energy to her studies.[7]  Perhaps she

does not study well,[8] and simply does not know the material, but is better able to conceal that fact

in other testing formats.  Ms. Singh even testified that she learned how to get partial credit for

books that she had not read by simply repeating things she had learned in the class discussion.

---

[6] Such anxiety would not be surprising, given plaintiff's strong desire to be a medical doctor and her relative unfamiliarity with timed multiple-choice tests.  Since she claims to have avoided such tests throughout college and to some extent high school, she may lack practice with them relative to her peers.  One's performance on tests certainly requires skills and practice typically gained by familiarity with the test format itself.  Similarly, students may have difficulty adjusting to the practice in medical school of being assessed for an entire term of material by one test lasting a few hours.  Although courts must review schools' compliance with the law requiring them to make accommodations for students with disabilities, the format in which the school chooses to assess its students is well within the school's discretion.  Indeed, certain testing formats may be chosen for their value in evaluating students not only on substantive grasp of the material, but also on their ability to perform well under pressure.

[7] The record is replete with testimony of Ms. Singh's extracurricular involvement and the number of people who suggested that she curtail or eliminate those activities in light of her academic difficulties.  (Trial Tr. 11/21/05 at 86-88, 110-11, 123; Trial Tr. 11/22/05 at 177-78, 200; Trial Tr. 11/23/05 at 346, 360-63, 368-69, 400, 465-66.)

[8] As noted *supra*, plaintiff admits that she listened to and sang along to music while studying.  Studying with such distractions might well cause one to perform poorly on a test of one's knowledge of the material.  Also, it would not be surprising if study practices that were sufficient to carry plaintiff through less competitive environments (such as high school and college as compared to medical school) failed to carry plaintiff through the rigors of medical school.

(Trial Tr. 11/21/05 at 16.)  Perhaps those same skills worked for her on other testing formats except timed multiple choice, which has no concept of partial credit.

To the extent plaintiff has demonstrated any pattern of her performance on multiple-choice tests as compared to other testing formats, any number of these or other factors may explain that discrepancy.  While the preponderance standard does not require plaintiff to rule out every other possible explanation, she must demonstrate that her explanation is more likely than not true.  As many other explanations remain plausible, this Court is not persuaded that she has a disability under the ADA (i.e., an impairment that substantially limits her ability to learn).  The testimony of plaintiff's expert, Dr. Newman, also fails to establish the requisite causal link.  Dr. Newman diagnosed plaintiff as suffering from a learning disability.  Dr. Newman's testimony is unpersuasive because of her sparse experience in the diagnosis and treatment of learning disabilities.[9]  The Court also notes that a mere diagnosis of a learning disability—such as Dr. Newman's diagnosis of plaintiff[10]—does not establish "disability" under the ADA absent sufficient corroborative evidence from the patient's own experiences.  *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999).  As is described below, plaintiff's spotty, anecdotal

---

[9] The record reflects that it is only recently that her practice has been devoted to any significant degree to diagnosing learning disabilities, and even now it does not comprise more than half of her caseload.  (Trial Tr. 11/22/05 at 147.)

[10] It should also be noted that there is some question as to the legitimacy of the data on which the diagnosis is based.  Plaintiff's performance on Dr. Newman's tests may have been affected by anxiety about her impending dismissal from medical school because it would deny her lifelong dream of becoming a doctor.  There is ample evidence that Ms. Singh was upset about her academic performance in medical school as well as at least one other event, the September 11 terrorist attacks.  (Trial Tr. 11/21/05 at 93-94, 101; Trial Tr. 11/22/05 at 191, 305-07; Trial Tr. 11/23/05 at 382-83, 405, 431-32, 471.)  While this Court declines to make a finding as to her mental condition, it does find that the evidence is sufficient to cast doubt on the accuracy of the test results.

corroborative evidence does not suffice.[11]

C.    *Plaintiff's Own Experience Does Not Demonstrate Substantial Limitation in Test-Taking, Let Alone Limitation in Learning in General.*

Plaintiff's own experience is replete with academic successes.  She performed extremely well in high school and college.  While she claims that she consistently performs much lower on multiple-choice tests than on other types of assessments, this Court does not find that she presented sufficient evidence to support that claim.  Plaintiff's evidence of the claimed discrepancy is overwhelmingly anecdotal and based solely on her memory of events that occurred years prior.  Ms. Singh describes a small number of tests and results, but does not offer data sufficient to establish a consistent pattern of performance over the years of her formal education.  If she has an impairment that substantially interferes even with test-taking, multiple-choice or otherwise, this Court would expect such interference to consistently appear throughout similar academic environments.  Her recent failures in medical school, and the relatively poor performance on some tests prior to medical school, have not been shown to be the result of her impairment.[12]

*    *    *

---

[11]The Court of Appeals noted ambiguity in this Court's original discussion of Dr. Newman's testimony.  In particular, the Court of Appeals was concerned that (1) it was unclear whether this Court believed that plaintiff did in fact have a learning disability and (2) the discussion confused the elements of "limitation" and "impairment."  508 F.3d at 1107.  As for (1), this modified discussion should make clear that the Court takes no position on whether plaintiff in fact had a learning disability; that issue is extraneous considering that (a) plaintiff established no consistent substantial limitation and (b) plaintiff did not establish that any limitation was the result of her impairment.  As for (2), this second version is more precise in its use of the terms "limitation" and "impairment."

[12]The Court of Appeals noted that this Court's original opinion, in concluding that plaintiff had not demonstrated substantial limitation, interpreted the testimony of the defense expert, Dr. Ostrander, in a manner not compelled by the testimony itself.  Upon further reflection, this Court agrees.  Because that interpretation of Dr. Ostrander's testimony was not an indispensable element of the Court's analysis, it has been omitted.

In light of all the evidence, this Court finds that there are many other factors that could have limited plaintiff's ability to perform well on tests—some of which were the result of plaintiff's own choices and study habits.  Plaintiff has failed to demonstrate that her low scores on certain tests were the result of a learning disability.  Thus, those low scores are not sufficient to convince this Court that she has a disability as defined by the ADA.  Similarly, considering all of the evidence plaintiff offered, taken together, and in light of defendant's evidence, this Court finds that plaintiff fails to establish by a preponderance that she suffers from a disability cognizable under the ADA.  Accordingly, she is not entitled to accommodations and defendant cannot be held to have violated the ADA by failing to provide her with accommodations.

As a final note, the Court would like to caution defendant that, as an educational institution, it is obligated to provide reasonable accommodations to students who demonstrate that they are entitled to them under the ADA.  Defendant's practice of dismissing a student after receiving documentation of the student's disability—and without even considering whether the disability exists—is imprudent given the possibility that the student actually does have a disability under the ADA.  If the request for reasonable accommodations is received prior to the official dismissal, as it was in this case, defendant must consider it before issuing its final decision whether to dismiss the student.  This is necessary not only so that defendant can avoid being held liable in a lawsuit where a plaintiff prevails, but also because defendant ought to be concerned about whether students truly have learning disabilities.  A well-regarded institution of higher learning, such as George Washington University, should be committed to the success of all its students, and surely that entails a sincere evaluation of their abilities and needs before issuing a decision to dismiss them.

15

## <u>CONCLUSION</u>

For the foregoing reasons, judgment consistent with these findings of fact and conclusions of law shall be entered for defendant.

A separate judgment shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, February 18, 2009.